In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4076

Frank M. Rosetto, et al., individually
and as representatives of a class of similarly
situated persons,

Plaintiffs-Appellants,

v.

Pabst Brewing Company, Inc.,

Defendant-Appellee.


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 96-C-1086--William E. Callahan, Jr., Magistrate Judge.


Argued May 18, 2000--Decided June 29, 2000


 Before Posner, Chief Judge, and Diane P. Wood and
Williams, Circuit Judges.

 Posner, Chief Judge.  This appeal from the grant
of summary judgment in favor of the defendant
requires us to reconsider the much-litigated
issue of when a right to health benefits that is
granted to retired workers by a collective
bargaining agreement (or an ERISA plan, but that
is not this case) survives the termination of the
agreement. See, e.g., Bidlack v. Wheelabrator
Corp., 993 F.2d 603 (7th Cir. 1993) (en banc);
Pabst Brewing Co. v. Corrao, 161 F.3d 434 (7th
Cir. 1998); Frahm v. Equitable Life Assurance
Society, 137 F.3d 955 (7th Cir. 1998); Diehl v.
Twin Disc, Inc., 102 F.3d 301 (7th Cir. 1996);
Murphy v. Keystone Steel & Wire Co., 61 F.3d 560
(7th Cir. 1995); Maurer v. Joy Technologies,
Inc., No. 98-3964, 2000 WL 572453 (6th Cir. May
12, 2000); Int'l Union, United Automobile,
Aerospace & Agricultural Implement Workers v.
Skinner Engine Co., 188 F.3d 130 (3d Cir. 1999);
Joyce v. Curtiss-Wright Corp., 171 F.3d 130 (2d
Cir. 1999); Int'l Ass'n of Machinists & Aerospace
Workers v. Masonite Corp., 122 F.3d 228 (5th Cir.
1997). The issue must be decided as a matter of
federal common law developed under the authority
of section 301 of the Taft-Hartley Act, 29 U.S.C.
sec. 185, as interpreted in Textile Workers Union
v. Lincoln Mills, 353 U.S. 448, 456-57 (1957);

see also United Steelworkers of America v. Rawson, 495 U.S. 362, 368 (1990); In re Bluffton Casting Corp., 186 F.3d 857, 862 (7th Cir. 1999), or, in the case of an ERISA plan, under the authority of ERISA. E.g., Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 55-56 (1987); Fox Valley & Vicinity Construction Workers Pension Fund v. Brown, 897 F.2d 275, 281 (7th Cir. 1990) (en banc); Trustmark Life Ins. Co. v. University of Chicago Hospitals, 207 F.3d 876, 881 (7th Cir. 2000).

The plaintiffs complain not only about the grant of summary judgment in favor of the defendant but also about the district court's denial of their discovery motion. The latter complaint has no possible merit. The motion was filed two months after the date set by the court for the completion of discovery. The plaintiffs gave (and give) no excuse for their tardiness, and so have no grounds for complaining about the district court's welcome effort to expedite the litigation and spare the parties the expense of protracted discovery, the bane of modern litigation.

The plaintiff class consists of some 45 retired machinists formerly employed at Pabst's brewery in Milwaukee, plus their spouses and dependents. The members of the class received health benefits under successive collective bargaining agreements between Pabst and the machinists' union until 1995, when the last such agreement expired (Pabst closed the brewery the following year). They claim that the agreements gave them a vested right to such benefits. The agreements contain three provisions, essentially unchanged from agreement to agreement, conferring benefits on retired employees and their dependents, that bear on this case: (a) Blue Cross and Blue Shield medigap insurance for retirees enrolled in Medicare, plus a Blue Cross-Blue Shield prescription drug program except insofar as the retiree "may become eligible [for a similar benefit] as a result of any future hospital-surgical legislation"; (b) for those retirees not enrolled in Medicare, the same coverage as for active employees; (c) "the coverage described in subsections (a) and (b) shall continue for the covered dependents of a deceased retired employee to the end of the sixth month following the month in which death occurs."

Pabst argues that it is clear from these provisions that they are effective only during the term of the collective bargaining agreement that contains them. If this is right--if someone who read these provisions without knowing anything about their background or real-world context would say, "Yes, it sure looks as if the provisions are in effect only for the term of the agreement in which they appear"--then Pabst is

off the hook as a matter of law (that is, the case would not reach the jury) unless the plaintiffs can adduce (1) objective evidence of (2) a latent, or, as it is sometimes called, an extrinsic, ambiguity. E.g., PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 614-15 (7th Cir. 1998); Mathews v. Sears Pension Plan, 144 F.3d 461, 466-67 (7th Cir. 1998); Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 568 (7th Cir. 1995); Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co., supra, 188 F.3d at 145. A latent ambiguity is an ambiguity (that is, something that makes it possible to interpret a document reasonably in more than one way, e.g., Anstett v. Eagle-Picher Industries, Inc., 203 F.3d 501, 503 (7th Cir. 2000); Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1037 (7th Cir. 1998); Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1070 (8th Cir. 2000)) that is recognized as such only when a contract clear on its face--clear, that is, to the uninformed reader--is applied to a particular dispute. Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., 165 F.3d 1157, 1162 (7th Cir. 1999); PMC, Inc. v. Sherwin-Williams Co., supra, 151 F.3d at 614; AM Int'l, Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 575 (7th Cir. 1995); GenCorp, Inc. v. American Int'l Underwriters, 178 F.3d 804, 818 (6th Cir. 1999); Charter Oil Co. v. American Employers' Ins. Co., 69 F.3d 1160, 1167 (D.C. Cir. 1995). The contract in Raffles v. Wichelhaus, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), for example, called for the shipment of cotton on the ship Peerless, which seemed clear enough; only it turned out that more than one ship of that name would be sailing from the same port--a fact that once revealed showed that the contract actually was ambiguous, because it was uncertain to which ship the contract referred. And the existence of the two ships was an "objective" fact in the sense, necessary to keep the latent-ambiguity doctrine from destroying reliance on written contracts, that establishing the fact did not require determining the credibility of a party's self-serving testimony.

 The doctrine of latent ambiguity comes into play, as we have said, only if someone who read the contract without knowledge of its real-world context of application would think it clear. If even this innocent reader would find the contract unclear--if, that is, an ambiguity is apparent just from reading the contract without having to know anything about how it interacts with the world--then the contract has what is called a patent, or intrinsic, ambiguity, and evidence is admissible to cure it. E.g., Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins.

Co., supra, 165 F.3d at 1161-62; Home Ins. Co. v. Chicago & Northwestern Transportation Co., 56 F.3d 763, 767-68 (7th Cir. 1995).

So far we have been describing general contract law, rather than anything special to the issue of "vested" employee health benefits (that is, benefits that continue beyond the expiration of the contract creating them). Our en banc decision in Bidlack established a presumption that an employee's entitlement to such benefits expires with the agreement creating the entitlement, rather than vesting, but that the presumption can be knocked out by a showing of genuine ambiguity, either patent or latent, beyond silence. Bidlack v. Wheelabrator Corp., supra, 993 F.2d at 606-07; see also Pabst Brewing Co. v. Corrao, supra, 161 F.3d at 440; Diehl v. Twin Disc, Inc., supra, 102 F.3d at 306; Murphy v. Keystone Steel & Wire Co., supra, 61 F.3d at 565.

Cases in other circuits are all over the lot. Some presume vesting. E.g., Maurer v. Joy Technologies, Inc., supra, 2000 WL 572453, at *6. Some insist that there be express language to that effect. E.g., Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co., supra, 188 F.3d at 139-47; Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994). Some presume nothing. E.g., Deboard v. Sunshine Mining & Refining Co., 208 F.3d 1228, 1240-41 (10th Cir. 2000); Chiles v. Ceridian Corp., 95 F.3d 1505, 1511-14 (10th Cir. 1996); Joyce v. Curtiss-Wright Corp., supra, 171 F.3d at 134-35; Barker v. Ceridian Corp., 122 F.3d 628, 634-38 (8th Cir. 1997); Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp., supra, 122 F.3d at 231-32.

One case holds that benefits are presumed to vest if they are conferred by a collective bargaining agreement rather than an unbargained-for ERISA plan, on the theory that employee interests are more likely to be reflected in a negotiated agreement than in one presented to employees as a condition of their employment. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983); contra, Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co., supra, 188 F.3d at 139. Several cases adopt the opposite presumption when (but only when) the benefits are conferred in an ERISA plan. E.g., Sprague v. General Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998) (en banc); Maurer v. Joy Technologies, Inc., supra, at *6. It can be argued that a reversal of these presumptions would make better sense--that if the union negotiated for such rights, they would surely

appear in the collective bargaining agreement, whereas an employee ought to get the benefit of vague language in his ERISA plan. The distinction between collective bargaining agreements and ERISA plans is not recognized in our cases, and we are not minded to embrace it now and make the law even more complicated than it is. What is clear and worth remarking, however, is that the interpretive problem will diminish, at least in this circuit, in the collective bargaining setting. For as word of the Bidlack presumption spreads and collective bargaining agreements are renegotiated, it will become obvious to unions that if they want to assure that employer-paid health benefits for the workers they represent are vested they will have to insist on explicit language to this effect.

Our presumption against vesting, it is important to emphasize, kicks in only if all the court has to go on is silence. If there is some positive indication of ambiguity, something to make you scratch your head (but the "something" must be either language in the plan or contract itself or the kind of objective evidence that can create a latent ambiguity under principles of contract law, Murphy v. Keystone Steel & Wire Co., supra, 61 F.3d at 565), the presumption falls out. The presumption is thus a default rule, that is, a rule to be applied when there is no other evidence, Bidlack v. Wheelabrator Corp., supra, 993 F.2d at 607, 609; E. Allan Farnsworth, Contracts sec. 7.16, p. 498 (3d ed. 1999), or what in earlier parlance was called an exploding presumption--one that disappeared once evidence was introduced, as distinct from an evidentiary presumption, which might continue to weigh in the decision maker's balance after other evidence came in. Language in American Federation of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 980 n. 3 (2d Cir. 1997), might lead a reader to think that Bidlack created an evidentiary presumption; it did not.

Bidlack enables the employer to fend off a trial without having thought to have included in the contract an express provision limiting the duration of the benefits. The presumption plugs the interpretive hole that would otherwise be left by silence about duration. But it remains open to a plaintiff to show that the relevant contractual provisions contain either patent or latent ambiguities.

Begin with patent ambiguity and recall the three provisions that bear on the issue of post-termination rights: (a) Blue Cross and Blue Shield medigap insurance for retirees enrolled in Medicare, plus a Blue Cross-Blue Shield prescription drug program except insofar as the

retiree "may become eligible [for a similar benefit] as a result of any future hospital-surgical legislation"; (b) for those retirees not enrolled in Medicare, the same coverage as for active employees; and (c) "the coverage described in subsections (a) and (b) shall continue for the covered dependents of a deceased retired employee to the end of the sixth month following the month in which death occurs." That the coverage in (c) is to continue for a specified time after the retiree dies sets at least an outer limit. But with regard to the duration of the benefits granted by (a) and (b), benefits sought in this case along with dependents' benefits, the contract is silent except insofar as the reference to future legislation in (a) might be thought to point beyond the expiration of the contract, which seems to us a weak inference. While there is no qualification explicitly negating such an inference--no "unless the collective bargaining agreement has expired" or "during the term of this agreement," the latter being the formula that we held in Pabst Brewing Co. v. Corrao eliminated any patent ambiguity--neither is there any language to suggest that these benefits survive the expiration of the agreement.

It is unclear whether the reference to coverage in clause (b) refers only to the scope of the benefits or also to how long they are to last, though the former seems the more natural meaning to impress on the words, which means that (b) is silent on duration. As is clause (a)--a silence that Pabst argues is pregnant in light of (c), which does mention duration, though not vesting. But the contrary inference to what Pabst seeks to draw from the comparison is as plausible. Dependent coverage, the subject of clause (c), would often continue for a very long time were it not truncated by the six-month provision. Retirees' dependents will generally be younger than retirees, as they may include children. And either because they are younger or because they are women--and retirees' spouses will generally be both, since most of Pabst's maintenance workers we may assume were men, and wives are on average younger than husbands--they will tend to have a longer life expectancy. True, the children will no longer be entitled to medical benefits once they reach adulthood and so cease to be dependents; nevertheless dependent coverage is more open-ended from a durational standpoint than coverage limited to retirees. And true too, the younger the dependents are, the lower their expected health costs are expected to be in the near term; but by the same token, if they are under 65 they are ineligible for Medicare and so may cost the employer more in health benefits than retirees do, since the benefits granted by

the collective bargaining agreement are supplementary to Medicare. For these reasons an employer might want to specify a time limit short of death for dependent benefits yet feel no similar need to limit the duration of retirees' benefits.

A search for patent ambiguity must canvass the entire agreement. A provision that seems ambiguous might be disambiguated elsewhere in the agreement. E.g., St. Paul Fire and Marine Ins. Co. v. Warwick Dyeing Corp., 26 F.3d 1195, 1199 (1st Cir. 1994); Kass v. Kass, 696 N.E.2d 174, 180-81 (N.Y. 1998). Pabst points us to the provision concerning active (as opposed to retired) employees and notes that the benefits conferred on them include "dependent children from age twenty-five (25) for life if totally and permanently disabled." But in arguing that this shows that the agreement is explicit when it means to confer lifetime benefits, Pabst overlooks the fact that obviously the benefits of active employees are only for as long as the collective bargaining agreement is in effect, since otherwise the employer's potential liabilities would be staggering. That is so obvious that if there is to be an exception (this fortunately tiny exception for permanently disabled children), we expect it to be explicit, not implicit.

But while Pabst has not proved that the contract clearly excludes vesting, we doubt that the plaintiffs have rebutted the Bidlack presumption by demonstrating a patent ambiguity. For when all the toing-and-froing is done, the fact remains that the clauses on which the plaintiffs mainly rely, clauses (a) and (b), are completely silent on duration, in contrast to Bidlack, where the collective bargaining said that "those employees who have retired since September 22, 1959 will have the full cost of their Blue Cross-Blue Shield coverage paid by the Company after they attain sixty-five (65) years of age" and that those benefits "shall be continued for the spouse after the death of the retiree." 933 F.2d at 605-606 (emphasis added); and see id. at 608. But we need not pursue the issue, as there is latent ambiguity here. The bulk of the workers at Pabst's Milwaukee brewery belonged to the brewery workers' union rather than, as the plaintiffs here did, to the machinists' union. Although these are separate unions, they negotiated essentially identical collective bargaining agreements, concerning health and welfare benefits at any rate, with Pabst--with a pregnant exception: In 1984 the collective bargaining agreement between Pabst and the brewery workers' union was amended to limit health and welfare benefits for the "term of this agreement." Pabst

Brewing Co. v. Corrao, supra, 161 F.3d at 435-36. No similar amendment was ever made to the agreement with the machinists, and the reason may be that there were so many more retired brewers than retired machinists--700 plus, versus only 45. It would be natural for Pabst to be more concerned about the cost of lifetime benefits for the former than for the latter. Another bit of evidence favoring the plaintiffs is that Schlitz Brewing Company, which had a collective bargaining agreement with the machinists' union that was identical to the agreement at issue in this case, continues to this day to provide health insurance to the retired machinists of its Milwaukee facilities, which it closed in 1981, Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994, 997 (7th Cir. 1993), after the expiration of the agreement. The point we made earlier, about the possible inference from (c) and the different average ages of retirees and their spouses and dependents, reappears as another bit of extrinsic evidence (extrinsic because the ages of the retirees, their spouses and dependents, do not appear in the contract) in support of the plaintiffs' interpretation.

Such evidence does not prove that that interpretation is correct, but it shows that the silence of the collective bargaining agreement with respect to vesting makes the agreement genuinely ambiguous and not merely incomplete. If it were merely incomplete, the Bidlack presumption would complete it and defeat the plaintiffs' case.

These items of evidence are "objective" in the sense (the relevant sense) that either they can be established by disinterested witnesses, or they are uncontested, or, as here, they are both. PMC, Inc. v. Sherwin-Williams Co., supra, 151 F.3d at 614; Mathews v. Sears Pension Plan, supra, 144 F.3d at 467; AM Int'l, Inc. v. Graphic Management Associates, Inc., supra, 44 F.3d at 575. Evidence is not objective when it is the self-serving testimony of one party to the contract as to what the contract, clear on its face, "really" means, contrary to what it seems to mean. Id.; PMC, Inc. v. Sherwin-Williams Co., supra, 151 F.3d at 614-15; Bank v. Truck Ins. Exchange, 51 F.3d 736, 737 (7th Cir. 1995); Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co., supra, 188 F.3d at 146. The plaintiffs want us to consider such testimony as well--testimony that a Pabst official, now conveniently dead, told the union that retirees had lifetime coverage. That testimony is self-serving, unverifiable, and therefore inadmissible to create a latent ambiguity.

But it is important to note that once a contract is found by the court to be patently or latently ambiguous, then (in most jurisdictions, in any event, and in the federal courts) any evidence that would normally be admissible in a trial becomes admissible to show what the contract meant. Dawn Equipment Co. v. Micro-Trak Systems, Inc., 186 F.3d 981, 987 (7th Cir. 1999); In re Modern Dairy of Champaign, Inc., 171 F.3d 1106, 1109 (7th Cir. 1999); Town of Norwood v. New England Power Co., 202 F.3d 408, 417 (1st Cir. 2000); Charter Oil Co. v. American Employers' Ins. Co., supra, 69 F.3d at 1168. This is more often assumed than articulated, but Charter Oil is a square holding, and we think it makes sense and therefore retract our contrary, and unreasoned, dictum in Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., supra, 165 F.3d at 1162. For, with the exception of the parol evidence rule (usually regarded, however, as a substantive rule of contract law rather than a rule of evidence, AM Int'l, Inc. v. Graphic Management Associates, Inc., supra, 44 F.3d at 576; Mohr v. Metro East Mfg. Co., 711 F.2d 69, 72 (7th Cir. 1983); Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1309 n. 47 (11th Cir. 1998); Farnsworth, supra, sec. 7.2, pp. 428-30), there are no special evidentiary rules for the trial of a breach of contract case. The rules concerning ambiguity are applied before trial, to see whether there is a triable issue. E.g., AM Int'l, Inc. v. Graphic Management Associates, Inc., supra, 44 F.3d at 575; GenCorp, Inc. v. American Int'l Underwriters, supra, 178 F.3d at 818. The rules function as gatekeepers, to prevent a disappointed contract party from ginning up a fishy story about what the contract really meant but didn't say. They are not rules of evidence governing the admissibility of evidence offered at trial, once ambiguity is found. For example, a union officer's testimony to what a company official once said the contract (which he had participated in negotiating) meant, although not usable to establish a latent ambiguity, would presumably be admissible at trial as the admission of a party opponent. Fed. R. Evid. 801(d)(2)(D).

To summarize the rule of law that we apply, and that requires reversal and a trial:

1.  If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement, as a matter of law (that is, without going beyond the pleadings), unless the plaintiff can show by objective evidence that the agreement is latently ambiguous, that is, that

anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says. This is the Bidlack presumption and its latent-ambiguity rebuttal.

2.  If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence. This is a general rule of contract law, independent of but consistent with Bidlack.

3.  If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. We are speaking of a case in which merely suggestive language creates a patent ambiguity.

4.  If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting objective evidence of meaning.

We trust that these simple rules will guide, and perhaps reduce (by facilitating settlement), further litigation over lifetime benefits in collective bargaining agreements and ERISA plans, and maybe litigation over other types of contract as well.

Reversed and Remanded.