In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1496

JAMES BARNETT, et al.,

*Plaintiffs-Appellants,*

*v.*

AMEREN CORPORATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03 C 402—**G. Patrick Murphy**, *Chief Judge.*

ARGUED OCTOBER 25, 2005—DECIDED FEBRUARY 8, 2006

Before COFFEY, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* In this case we are presented with the "much-litigated issue" of retired employees' rights to health-care benefits from a former employer. *See Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 541 (7th Cir. 2000) (listing similar cases). The plaintiffs are retired employees of defendant Ameren Corporation. In the district court, they argued a trial was necessary on their claim of lifetime entitlement to health benefits from Ameren and that class certification was proper. The district court denied class certification and granted summary judgment for Ameren. We affirm.

## I.  HISTORY

The plaintiffs in this case are former employees, or surviving spouses of former employees, of the Ameren family of companies who retired between January 1, 1992, and October 1, 2002. Ameren was created in 1997 through a merger of Union Electric ("UE") and Central Illinois Public Service ("CIPS"). Most of the plaintiffs retired before the 1997 merger, and therefore worked for either UE or CIPS, though a few continued their service and retired after Ameren was formed.

It had been the longstanding practice of both UE and CIPS to provide health-care benefits to their retirees. The plaintiffs, and their unions, are adamant that this practice was actually an obligation that transcended the life of any Collective Bargaining Agreement ("CBA"). Ameren, however, takes the position that any obligation to provide health-care benefits for retired employees extended no longer than any relevant CBA, almost all of which expired three years after formed. This dispute has apparently been simmering for decades, with the companies continuing to provide these benefits while claiming the right to terminate them and the retirees continuing to accept the benefits while claiming them as an entitlement. Changes have been made to the benefits over the years, but for one reason or another these changes have never forced a resolution; that is, until now. The dispute boiled over, and this lawsuit resulted, when in 2003 Ameren unilaterally declared that by 2009 retirees would have to pay for 25% of their premiums and 50% of their dependents' premiums.

The relationship between the parties has been governed by numerous CBAs enacted over the years. The plaintiffs point to two portions of contractual language, which they believe create ambiguity as to whether they, as retirees, were granted lifetime health-care benefits.

The first portion of relevant contractual language came into existence in late 1993 and early 1994 when UE announced that due to a change in accounting standards retirees would need to pay more for health care. Negotiations began and resulted in a Stipulation of Agreement ("Stipulation") signed by the unions and UE on November 22, 1993. This Stipulation contained a section which provided that "employees retiring on or after July 1, 1994, require 10 years vested service after age 45 to be eligible for post-retirement medical and life insurance," and that "[f]or the year 1995 and all subsequent years, . . . retiree [would be required to] pay 20% of the monthly dependent major medical premium." A little less than two months later, the Stipulation was followed up with a Supplementary Agreement ("SA"), signed on January 14, 1994, which provided the company would "take such action as may be necessary to modify and to continue for the life of the Labor Agreement" health-care benefits "for active employees who retire on or after July 1, 1994."[1] The SA also restated the Stipulation's previous requirement of vested service as follows: "The [health care plan] will be amended to provide that employees retiring on or after July 1, 1994, 10 years vesting service after age 45 will be required to be eligible for post-retirement medical insurance." Both the Stipulation and the SA also covered changes in life insurance, a Social Security option, and a provision coordinating the UE plan with Medicare.

The second portion of relevant contractual language was contained in a CIPS medical plan. In 1995, the unions and CIPS went so far as to memorialize their

---

[1] The Stipulation was a single document signed by UE and all the unions, while the SA was actually a number of separate agreements between UE and the various unions. For purposes of this appeal, the various SAs were the same in that all of the agreements contained the language quoted above.

differing views on the duration of retirees' health-care benefits in a section of the 1995 medical plan entitled "AMENDMENT AND TERMINATION OF PLAN":

> [I]t is the position of the Company that this Plan and any or all benefits provided hereunder may be amended or terminated at any time or from time to time by the Company in its sole discretion by its President or any one of its Vice Presidents. It is the positions of [the unions] that the Company may not terminate the benefits of currently retired employees.

The 1997 restatement of this medical plan contained similar language.

The plaintiffs also direct us to a slew of extrinsic evidence, including various opinions of union representatives as to the nature of Ameren's obligation, as well as deposition and other testimony of company officials which the plaintiffs believe support their case. As we explain below, this extrinsic evidence is not proper to stave off summary judgment.

## II. ANALYSIS

Because the parties only dispute the application of settled law to the facts of this case, we will only briefly review the relevant legal principles. Unlike pension benefits, ERISA does not require the vesting of health-care benefits. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (citations omitted). "[I]f they vest at all, they do so under the terms of a particular contract." *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998). Therefore, as harsh as it may sound, in the absence of a contractual obligation "employers are 'generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans.'" *Bland*, 401 F.3d at 783 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)). If a CBA or other

governing document provides for health-care benefits for retirees, but is silent on the issue of whether or not those benefits exceed the life of the agreement, then in this circuit the presumption is that the benefits expire with the agreement. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-08 (7th Cir. 1993) (en banc). However, general contract law still applies, and in the event of a patent or latent ambiguity, a plaintiff may be entitled to a trial where extrinsic evidence can be introduced to establish the true intent of the agreement. *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 547 (7th Cir. 2000) (summarizing four rules governing "litigation over lifetime benefits in collective bargaining agreements and ERISA plans"). As this issue is essentially one of contract interpretation, it lends itself to resolution by summary judgment because while any disputed facts are settled in the nonmovant's favor, the determination of whether a contract is ambiguous is a matter of law. *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996).

Plaintiffs admit that the governing documents do not unambiguously create a lifetime entitlement to health-care benefits. But they are adamant that their case is one where both patent and latent ambiguities require a trial on the merits. Ameren, of course, disagrees. If Ameren is correct, then plaintiffs lose, because absent an ambiguity, the agreements are at best silent on the issue of the duration of the health-care benefits, which triggers the presumption that benefits expire with the agreement. *See Bidlack*, 993 F.2d at 606-08. Furthermore, absent ambiguity, plaintiffs may not rely upon extrinsic evidence to oppose summary judgment. *Id.* at 608.

We begin by evaluating the documents for patent ambiguities. *Rossetto*, 217 F.3d at 543. A patent ambiguity is one that exists on the face of the documents. *Id.* The plaintiffs urge us to find such ambiguity in the use of the terms "vested service" and "vesting service" in the Stipulation and

SA. Ameren responds that the terms are merely used to denote which retiring employees are eligible for health benefits during the life of the labor agreement.

We might be inclined to side with the plaintiffs, if we followed their lead and focused solely on the terms "vested" and "vesting." But a determination as to the ambiguity of a written agreement is not so limited: "A provision that seems ambiguous might be disambiguated elsewhere in the agreement." *Id.* at 545 (citations omitted); *see also Bland*, 401 F.3d at 784 ("Only if the language of the plan document is ambiguous and these ambiguities are not clarified elsewhere in the document may we consider evidence of the parties' intent that is extrinsic to the writing.") (citation omitted). Contractual provisions must be read in a manner that makes them consistent with each other. *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) ("We must resolve the tension between the lifetime benefits clause, and the plan termination and reservation of rights clauses, by giving meaning to all of them."). Accordingly, "[w]e have held that, when 'lifetime' benefits are granted by the same contract that reserves the right to change or terminate the benefits, the 'lifetime' benefits are not vested." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 634-35 (7th Cir. 2004) (citing *Rockford Powertrain*, 350 F.3d at 704). The reason for such a holding is that benefits described as "lifetime" are not really vested when the same contract also reserves the right to revoke them, because the only proper construction of the two seemingly conflicting provisions is that the "lifetime" benefits are "good for life unless revoked or modified." *Id.* at 633; *compare Bland*, 401 F.3d at 788 (finding ambiguity where there was "no reservation of rights clause to constrain the interpretation of explicit 'lifetime' language").

The error in the plaintiffs' construction of the Stipulation and SA is that it completely ignores the limitation on

benefits created by the SA, namely that the company would "take such action as may be necessary to modify and to continue *for the life of the Labor Agreement*" the provisions of the health-care plan. (emphasis added). This explicit limitation as to the duration of the health-care benefits removes any ambiguity as to the terms "vested" and "vesting." Therefore, in accordance with our precedent, we must accept Ameren's construction of the terms as an eligibility requirement for obtaining benefits during the life of the agreement because it is the only way to give effect to the clause limiting the benefits to the life of the CBA. *See Vallone*, 375 F.3d at 633 (citing authority).

The plaintiffs' only response to this conclusion is to assert that the "life of the Labor Agreement" language was unilaterally inserted by UE into the SA. We are somewhat puzzled by what to do with this argument, because plaintiffs are not arguing that the SA in general, or the limitation on duration provision in particular, is unenforceable because of fraud or for some other reason. Moreover, plaintiffs rely on the portions of the SA they like and even urge us to read the Stipulation and the SA *in pari materia.* Thus, it appears that plaintiffs want us to consider parts of the SA ("vested" and "vesting") while ignoring others ("for the life of the Labor Agreement"). This we cannot do.[2] *See Vallone*, 375 F.3d at 633.

_____

[2] The parties' briefs dispute whether the doctrine of *contra proferentem* applies to CBAs. To the extent the argument is that the reservation of rights language in the SA should be ignored because UE allegedly was its sole creator, we reject it. The doctrine exists to "resolve . . . ambiguities," *see Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 666 (7th Cir. 2005), not to create them. It is applied, if at all, after a contract is deemed ambiguous and after extrinsic evidence fails to cure the ambiguity. *Bidlack*, 993 F.2d at 609. In this case, we find no ambiguity, and, therefore,

(continued...)

The plaintiffs also find ambiguity in the agreement to disagree between the unions and CIPS, arguing without citation that an ambiguity cannot be more clearly expressed than when the parties document their competing positions. But we must remember that an ambiguity is "something that makes it possible to interpret a document *reasonably* in more than one way." *Rossetto*, 217 F.3d at 542 (citing cases) (emphasis added). The problem for the plaintiffs is that it is not reasonable to read this stark agreement to disagree as actually resulting in an agreement on CIPS's part to provide vested health-care benefits to retirees. The only reasonable interpretation of this contractual provision is that there was no agreement as to the vested nature of the benefits. Extrinsic evidence is used to clarify an ambiguous *agreement*; it is not allowed to circumvent the requirement of mutual assent thereby allowing a party to create through litigation an obligation it was unsuccessful in obtaining during negotiations.[3]

We also find no latent ambiguities. Plaintiffs attempt to analogize to *Rossetto* by arguing that a latent ambiguity exists as to the SA and Stipulation because those documents also provided for other welfare benefits that have not been changed by Ameren. We emphasize that these other benefits were provided under the Stipula-

---

[2] (...continued)
have no use for the doctrine of *contra proferentem*.

[3] Plaintiffs also make the strained argument that a 1993 Summary Plan Description from CIPS is patently ambiguous because it "appears to acknowledge that negotiated benefits could only be changed through subsequent negotiations." This argument, as well as the "evergreen" theory plaintiffs press, are nonstarters because they presume as true what the plaintiffs are trying to prove. These arguments would only benefit the plaintiffs if they could first show a CBA establishing lifetime health-care benefits for retirees, which they cannot do.

tion and SA discussed above. Therefore the language used for these benefits provides no basis—other than the one we have already rejected—for determining that benefits are vested. Thus, this case is unlike *Rossetto* where the court found a latent ambiguity in a "pregnant exception" between otherwise identical CBAs. *Rossetto*, 217 F.3d at 545-46 (finding a latent ambiguity where a parallel CBA with the brewery workers' union was amended to explicitly limit health-care benefits to the "term of [the] agreement," while the CBA of the plaintiffs machinists' union was renewed without such a limitation). What the plaintiffs' argument boils down to is that their health-care benefits must continue for the rest of their lives because other benefits have not been cut by Ameren. But, as Ameren points out, other courts have rejected the argument that health-care benefits vest simply because a company has not reduced them in the past, *see In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 906 (3d Cir. 1995), and this conclusion is consistent with our presumption against vesting. *See Bidlack*, 993 F.2d at 606-08.

Throughout their briefs plaintiffs point us to various recollections and opinions of union representatives, none of which we will consider on the issue of a latent ambiguity. *Rossetto*, 217 F.3d 546 (explaining that a "party's self-serving testimony" cannot establish a latent ambiguity). The plaintiffs also rely heavily upon isolated comments made by company representatives. Many of the comments are inconclusive deposition testimony, though some indicate that lifetime health-care benefits were discussed in some manner during negotiations. There is also a reference by a CIPS official justifying certain accounting changes on the basis of an "implicit labor contract" to provide health care to retirees.

Even assuming these comments are properly considered for purposes of establishing a latent ambiguity, they cannot

carry the day for plaintiffs. It is not enough that the plaintiffs provide "objective" evidence; "[t]he evidence must [also] create a sufficient doubt about what the contract means to warrant submitting that meaning to a determination by a trial." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 614-15 (7th Cir. 1998). That doubt has not been created here. A few isolated comments by company officials, the most significant of which were made during negotiations resulting in an agreement *contrary* to plaintiffs' position, and others far from definitive as to any obligation to provide lifetime health-care benefits do not allow us to look beyond the written contracts agreed to by the parties. *Id.*

We are mindful of the difficulties faced by those who have worked hard their whole lives only to be saddled during retirement with the additional pressure of unexpected increases in the cost (and in other instances the outright termination) of health-care benefits. However, we are bound to determine only whether a legally sufficient agreement between the parties exists to support the plaintiffs' claim. Finding none, we must affirm the ruling of the district court granting summary judgment for Ameren. Accordingly, we need not address plaintiffs' arguments regarding class certification.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

No. 05-1496                                                                11

A true Copy:

  Teste:

          _____
          *Clerk of the United States Court of*
          *Appeals for the Seventh Circuit*